CITY OF INDIANAPOLIS v. NATIONAL CITY BANK OF INDIANAPOLIS.

[No. 11,473. Filed March 29, 1923. Rehearing denied October 30, 1923. Transfer denied January 11, 1924.]

1. APPEAL.—*Demurrer to Answer Overruled.—Harmless Error. —Statute.*—Under the provisions of §350 Burns 1914, §346 R. S. 1881, where no evidence was adduced by the defendant that would not have been admissible under the general denial, which is pleaded, there could be no reversible error in overruling a demurrer to an affirmative paragraph of answer, even if technically erroneous. p. 685.

2. MUNICIPAL CORPORATIONS.—*Board of Public Works.—Allowance of Claims.—Power of Board.*—Under the statute governing the issue of warrants to employes of the city of Indianapolis (§§8690, 8696 Burns 1914, Acts 1905 p. 385), the board of public works had authority to allow or disallow claims of that kind, and allowance thereof was a *quasi* judicial act, though done in reliance on a certificate by the street commissioner. p. 687.

3. MUNICIPAL CORPORATIONS.—*Approval of Claims.—Power of Controller.—Statute.*—Under §8690 Burns 1914, the city controller of the city of Indianapolis, as head of the finance department, has power to investigate claims against the city, and to approve or disapprove any item, notwithstanding the allowance of such claims by the board of works, and, for that purpose, he has power to subpoena witnesses and examine them under oath and to procure whatever evidence he deems necessary to determine the validity of any claim, or part thereof, which makes his action in that regard *quasi* judicial. p. 687.

4. MUNICIPAL CORPORATIONS.—*City Indebtedness.—Payment of. —Public Depository Law.—Statute.*—Under the municipal code of 1905, (§§8835, 8836 Burns 1914, Acts 1909 p. 459) the city treasurer was made the custodian of all funds, the legal title to all such funds vesting in the treasurer, and it was his duty to pay all city orders when presented which were "properly indorsed," and when the funds were deposited by him in a bank, the relation of bank and depositor existed between the bank and the treasurer, but the Public Depository Law (Acts 1911 p. 616, §7545 Burns 1914) changed that plan, and now the legal title to the funds vests in the municipality, and when the funds are deposited in a public depository, the relation of de-

pository and depositor is thereby created between the depository and the municipality, and payments must be made in accordance with the plan specified in said law.   p. 688.

5.   MUNICIPAL CORPORATIONS.—*Payment of Orders.—Depository Law.—Statute.*—Under the Public Depository Law of 1907, as amended in 1911 (Acts 1911 p. 616, §7545 Burns 1914), the city treasurer is required to stamp and countersign all city warrants or orders, and the action of the treasurer in stamping and countersigning such warrants and orders is a positive direction to the depository to pay them, and it is not the duty of the depository to inquire concerning the regularity of allowances or the validity of the warrants issued thereon, and the city will not be allowed to assert, as against the depository, that the allowances were obtained by fraud.   p. 689.

6.   MUNICIPAL CORPORATIONS.—*Public Depository.—Payment of Orders.—Fictitious Payee.*—Orders issued by a city in payment of its employes are not checks or negotiable instruments payable to bearer, but when they are issued for the purpose of paying what is supposed to be a *bona fide* indebtedness of the city to employes, they must be paid only to real persons, and it is the duty of the public depository, on which they are issued, to exercise the same care in paying them that a bank must exercise in paying checks, and it would be liable to the city for payment negligently made to fictitious persons, if the city official issuing them believed he was issuing such orders to a real person.   p. 690.

7.   APPEAL.—*Instructions.—Error in.*—Where the jury returns the only verdict that could lawfully be rendered on the evidence, nothing in an instruction could constitute reversible error.   p. 694.

8.   CONSTITUTIONAL LAW.—*Separate Departments of Government.*—The legislature may not strike down the rights of the citizens by invading the province of the judicial department of the state government.   p. 694.

9.   CONSTITUTIONAL LAW.—*Construction of Statute.*—Where a statute is susceptible of two constructions, one of which would render it constitutional and the other one unconstitutional, it is the duty of the courts, in construing it, to adopt the former.   p. 694.

10.   TRIAL.—*Evidence.—Documentary.—Report of Examiner.—Admissibility.*—That provision of the Public Accounting Law (Acts 1909 p. 136, §7546i Burns 1914) specifying that any report of an examiner as to the condition of a public office, when duly certified by the State Examiner, "shall be taken and re-

City of Indianapolis *v.* Nat. City Bank—80 Ind. App. 677.

ceived in any and all courts of this state as evidence of the facts in such reports stated and contained," is construed to mean that such reports only as are found to be competent under the established rules of evidence and in the particular kind of action authorized by the statutes relating to the subject of public accounting, shall be received by the courts. p. 694.

11. TRIAL.—*Evidence.*—*Ex Parte Investigation.*—*Admissibility.* —In an action by a city against a depository of its funds to recover amounts paid the depository on warrants alleged to have been issued by a city official to fictitious payees, the testimony of a person who had made an investigation as to whether the persons of the same name living in the city had indorsed the warrants is inadmissible. p. 695.

12. TRIAL.—*Evidence.*—*Documentary.*—*City Directory.*—*Admissibility.*—In an action by a city against a depository of its funds to recover amounts paid by the depository on warrants alleged to have been issued by a city official to fictitious payees, a page of the city directory, the names for which were procured between October 1 and December 31 of the previous year, is inadmissible to prove that no such person as one named in a warrant issued in June of the year the directory was published lived in the city at that time. p. 696.

13. BANKS AND BANKING.—*Checks.*—*Identity of Payee.*—The rule that a bank on which a check is drawn must ascertain, at its peril, the identity of the person named as payee is limited to those cases in which the check is presented for payment by a person who claims to be the payee, limiting the rule as stated in *Citizen's National Bank* v. *Reynolds,* 72 Ind. App. 611. p. 696.

14. BANKS AND BANKING.—*Checks.*—*Payment.*—*Directions of Drawer.*—The general rule is that a bank may not have credit for money paid on its depositor's check unless the payment has been made strictly in accordance with the depositor's directions stated in the check, but there are exceptions to this rule. p. 697.

15. BANKS AND BANKING.—*Checks.*—*Signature of Indorsers.*— While a bank is bound to know the signatures of its depositors, it is not bound to know the signature of every person to whom a depositor issues checks. p. 697.

16. BANKS AND BANKING.—*Checks.*—*Successive Indorsements.*— *Genuineness of Payees.*—When a check is presented for payment by an indorsee, the bank is not bound to investigate the genuineness of the signature purporting to be the payee's indorsement, but may rely upon the subsequent indorsements. p. 697.

17. BANKS AND BANKING.—*Checks.*—*Forged Indorsement of Payee.*—Ordinarily, a bank that·has paid a check of one of its depositors on a forged indorsement of the payee cannot have ·credit therefor against the account of its depositor, but the depositor must have exercised due diligence in the matter of examining his canceled checks and in giving the bank timely notice of the forgery, or he cannot recover from the bank. p. 697.

From Marion Superior Court (A7,865) ; *Linn D. Hay,* Judge.

*U. S. Lesh,* Attorney General, *Taylor E. Groninger, Dale F. Stansbury* and *Willard B. Gemmill,* for appellant.

*Charles W. Miller* and *Henry M. Dowling,* for appellee.

This action was instituted by the attorney-general, in the name of the city of Indianapolis, against the National City Bank of Indianapolis, by filing the following complaint:

"The plaintiff, City of Indianapolis, complains of the defendant, National City Bank of Indianapolis, a corporation, and alleges:

"That the plaintiff is now, and during the years 1914 and 1915 was, a municipal corporation and a city of the first class; that the defendant during said years was carrying on a general banking business in the city of Indianapolis and was a duly selected and acting public depository of said city.

"That on each of the dates hereinafter mentioned, the plaintiff had on deposit with the defendant, as a public depository of said city, subject to be drawn out by check, a sum of money greater than the amount of the checks hereinafter described; that on the dates hereinafter mentioned in the years 1914 and 1915, one Dennis J. Bush, street commissioner of said city, practiced a fraud on plaintiff and the members of the board of pub-

lic works, the city controller and the city treasurer, by
filing with and presenting to the board of public works
false and fraudulent claims in the names of fictitious
or non-existing persons for work alleged to have been
done for the city; that the members of the board of
public works, relying upon the certificate of said street
commissioner, and not knowing or ascertaining that
said claims were filed for fictitious or nonexisting per-
sons, allowed them; that thereafter the claims, as al-
lowed by the board of public works, were presented to
Jacob P. Dunn, city controller, who approved them and
drew warrants on the treasurer of the city for their
payment, which warrants were signed by him as such
officer by writing his name, J. P. Dunn; that there-
after the warrants were presented by the city controller
to Carl von Hake, treasurer of the city, who counter-
signed them and stamped thereon the name of the de-
fendant, 'National City Bank, Indianapolis, Ind.,' as the
public depository and banking institution where the
warrants would be paid, thereby making the warrants
checks on the defendant; that the city treasurer deliv-
ered the checks to the city controller, who delivered
them to the street department for the purpose of deliv-
ery to the payee therein named.

"That on account of the fraud practiced on the mem-
bers of the board of public works, on the city controller
and the city treasurer, the city controller was induced
to approve, sign, and present to the city treasurer the
warrants which were payable to fictitious or nonexist-
ing persons; and the city treasurer was induced to
countersign the warrants and stamp them with the
name of the defendant, thereby making the warrants
checks payable to fictitious or nonexisting persons; that
the checks which said officers were thus induced to exe-
cute and deliver as aforesaid, were as follows:

City of Indianapolis *v.* Nat. City Bank—80 Ind. App. 677.

| | | |
|---|---|---|
| | OFFICE OF CITY CONTROLLER | No. 15296 |
| | Board of Public Works—Salaries | |
| | TREASURER OF THE CITY OF INDIANAPOLIS: | 6-2-15 |
| Countersigned: Carl von Hake Treasurer | Pay *Frank Akers*_____OR ORDER | $17.00 |
| | Subject to All Delinquent Taxes | |
| | *Seventeen and* no/100_____Dollars | |
| | ALLOWED BY BOARD OF PUBLIC WORKS | |
| | Payable at National City Bank Indianapolis, Ind. | J. P. Dunn City Controller |

[Here the other eighty-two checks involved are copied in full.]

"That there were no such persons as Frank Akers [and the other eighty-two named as payees in the checks]; that the city controller and the city treasurer believed at said times that there were such persons, and so believed when said checks were executed and delivered as aforesaid; that the city controller had no knowledge that said claims for fictitious and nonexisting persons were false and fradulent when he approved them and had no knowledge that the claims were filed in the names of fictitious or nonexisting persons, and when he signed the warrants he did not know that the payees therein named were fictitious or nonexisting persons; that when the city treasurer countersigned said warrants and stamped them with the name of a public depository and returned them to the city controller, he had no knowledge that the payees therein named were fictitious or nonexisting persons; the members of the board of public works, the city controller and the city treasurer were not careless or negligent respecting the said transactions, but instead were ordinarily careful and prudent in respect thereof.

"That after said checks were delivered by the city controller to the street department to be delivered to the payees therein named, one James McCrossan, chief

clerk of said department, or some other person or persons unknown to plaintiff, wrote the name of the payee named in each check across the back thereof, and each was presented to the defendant and paid, and the defendant charged the amount of each of said checks against the account of plaintiff; that the members of the board of public works, the city controller and the city treasurer had no knowledge of the forged indorsements of the names of fictitious or nonexisting persons, on said checks until after the defendant had paid them; that the plaintiff, before the commencement of this action, demanded of the defendant the payment of the sum paid by it on said checks, which defendant refused, and has not, either before or since said demand, paid the sum or any part thereof.

"That the amount paid by the defendant in payment of said checks and charged to the plaintiff was $1,359.20, which sum with interest thereon from the dates of the various payments, is unpaid and due from the defendant to the plaintiff; that heretofore, by authority of the state examiner of the State Board of Accounts, an examination was made of the office of city controller of the city of Indianapolis and that a report of said examination was made, signed, verified, and filed [as directed by statute] ; that one copy was transmitted by the Governor to the attorney-general, and the attorney-general hereby institutes and prosecutes this civil proceeding against the defendant in order to carry into effect the findings resulting from such examination and to secure to the said city of Indianapolis the amount due it from the defendant as hereinbefore alleged.

"Wherefore, the plaintiff demands judgment against the defendant for $1,900, and all other proper relief."

A demurrer to the complaint on the ground that it does not state facts sufficient to constitute a cause of action, was overruled. The defendant filed an answer

in eight paragraphs. A demurrer was sustained to the third, fourth and fifth paragraphs of the answer, and overruled as to the second, sixth and eighth. The first paragraph of the answer is the general denial; the second is on the theory of estoppel and avers that the bank was deceived by the negligent conduct of the city officers; the sixth pleads facts tending to show that each order was payable to bearer; and the eighth is on the theory of estoppel and avers (in addition to other averments) that, once each month, the bank balanced the plaintiff's pass book and delivered the pass book, together with the orders for the payment of which the bank claimed credit, to the plaintiff; and that the plaintiff never complained or gave notice to the plaintiff that any of the orders were fraudulent until long after the last order had been paid. A reply in denial closed the issues. The trial resulted in a verdict for the defendant.

The plaintiff filed a motion for a new trial on the following grounds: (1) That the verdict is not sustained by sufficient evidence; (2) that the verdict is contrary to law; (3) that the court erred in excluding from the evidence the plaintiff's exhibit No. 2, which is a report made to the state examiner by the field examiners, of an examination of the affairs of the city controller; (4) that the court erred in refusing to permit the witness Mr. Thomas, one of the field examiners, to state to the jury whether his investigation disclosed that persons bearing the names used as the names of payees in the orders had indorsed the orders; (5) that the court erred in excluding from the evidence a portion of page 163 of the Indianapolis city directory for the year 1915, published by R. L. Polk & Co., after identification and explanation; and (6) that the court erred in certain instructions given, and in rejecting certain instructions tendered. The motion for a new trial was overruled. The errors assigned challenge the ruling on the de-

murrer to the second, sixth and eighth paragraphs of answer, and the ruling on the motion for a new trial.

DAUSMAN, J. (after stating the foregoing facts) : An extended discussion of the merits of the second, sixth and eighth paragraphs of the answer would serve

1.  no useful purpose. It is sufficient to say that, excepting the averments relating to the balancing of the pass book, the facts averred in these paragraphs were substantially the facts averred in. the complaint. The only purpose of these paragraphs (with the exception above stated) was to present the defendant's theory of the legal effect of the facts. See *Trinkle* v. *Ladoga Building, etc., Assn.* (1917), 65 Ind. App. 415, 423, 117 N. E. 542. No evidence was adduced under these paragraphs which would not have been admissible under the general denial; and therefore, because of the provision of the Code applicable to this feature, the ruling on the demurrer could not be reversible error even if technically erroneous. §350 Burns 1914, §345 R. S. 1881.

We must now discover, if possible, the true theory of the complaint; for a definite understanding of that theory is essential to an intelligent consideration of the motion for a new trial.

By indulging inferences with a liberality which can hardly be justified, it may be said that the cause of action rests on the ground that the street commissioner, for the purpose of defrauding the city, falsely represented to the board of public works that certain persons were entitled to wages for work done by them on the streets; that in truth there were no such persons and that they had no existence except in the imagination of the street commissioner; that in making the allowances, in preparing and delivering the orders to the street commissioner, the city officers believed that the payees were real persons; that since, in truth, the

payees were the exclusive creatures of the street commissioner's imagination, any signature which purports to be the indorsement of any payee must necessarily be a forgery; and that, therefore, the depository is liable for paying the orders on the forged indorsements. No other valid theory of liability can be constructed from the facts averred. No cross-error has been assigned and the sufficiency of the complaint is not questioned in this court.

To meet the contentions of the parties, an inquiry into the regularity of the method pursued by the city officers in allowing the claims and issuing the orders, is essential.

The general Act of 1905, prescribing the details of municipal government, as amended, provides that the board of public works shall have power to repair, clean, light, and sprinkle the streets, alleys and other public places within the city; and that this work may be done either by contract or by the board itself. §8696 Burns 1914, Acts 1913 p. 253. The only inference to be drawn from the complaint is that the board elected to do the street work itself by and through its own employes. See *Brunaugh* v. *State* (1910), 173 Ind. 483, 90 N. E. 1019. No statute has been pointed out to us, and we know of none, which provides for any such officer as street commissioner. Therefore we indulge the further inference that the street-working force was organized, and for convenience was designated "Street Department;" that one Dennis J. Bush had general supervision of the laborers engaged in street work and for convenience was designated "Street Commissioner;" that the department in all respects was under the immediate direction and control of the board of public works; and that Bush furnished the board, from time to time, information concerning wages due the men employed in the street department.

Under the statutory plan for the payment of claims originating in the department of public works, if the workmen were to receive their wages, it was

2. essential that the board should take some action on the claims reported to it by Bush; for no order could be drawn on the treasurer by the controller for the payment of the claims without a "warrant" from the board. §8690 Burns 1914, Acts 1909 p. 385. By implication, the statute confers ample power upon the board to allow or disallow claims of that kind. §§8690, 8696 Burns 1914, *supra; Brunaugh* v. *State, supra.* The averment is that, relying on some sort of certificate made by Bush, and "not knowing or ascertaining that the claims were filed for fictitious or nonexisting persons," the board allowed them.

It is averred that the claims, as allowed by the board, were presented to the controller. That averment may

3. be taken to mean that the board presented to the controller what the statute denominates a "warrant" and that the "warrant" was based upon the claims thus allowed. With respect to this averment, it should be observed that the controller, as head of the finance department, had ample power to investigate the claims and to approve or disapprove any item in the warrant, notwithstanding the allowance by the board. He had power to require evidence to enable him to determine whether the amount claimed in any item was justly due; and, for that purpose, he was authorized to summon before him any officer, agent or employe, of any department, or any other person, and to examine him upon oath relative to the claims or the warrant. §8690 Burns 1914, *supra; Brunaugh* v. *State, supra.* The controller approved the claims, and his action in that regard was *quasi* judicial.

It is of the utmost importance to note—and the fact should be clearly understood and fully appreciated—

that the city officials and the depository were
4.  operating under the direction of certain statutes.

There can be no accurate reasoning on the subject which does not rest on that foundation. The governmental act of 1905 made the treasurer the custodian of city funds, and made it his duty to pay all city orders when presented and "properly indorsed." Under that law, it would be his duty, when an order is presented, to ascertain if the payee owes the city on account of "any debt, tax or assessment," and if anything is found to be due the city from the payee, then to apply the order, or so much thereof as necessary for that purpose, to the payment of the tax or assessment; and, upon the payment of any order, to stamp on its face the word "redeemed." That law also requires the treasurer to furnish the controller, on the first day of each month, a statement of all receipts and disbursements made by him during the previous month; to deliver to the controller all orders redeemed and canceled by him during the same period; and to take the controller's receipt therefor. It requires the controller to lay the statement, together with the redeemed orders, before the common council at its next meeting, to be disposed of as the council may direct. §§8835, 8836, 8837 Burns 1914, Acts 1905 p. 236; §8656 Burns 1914, Acts 1909 p. 459. From the language of that statute it clearly appears that the legislature intended that every order should be delivered to the payee when drawn, and that the payee should present it to the treasurer for payment. Under that law, the legal title to the funds vested in the treasurer, and when the funds were deposited, the relation of bank and depositor existed between the bank and the treasurer, and payments were made by the bank on the treasurer's checks. But the Act of 1907, commonly known as the Depository Law, has changed that plan. The later act provides that—

"All warrants and orders for the payment of public money, excepting state and township funds, shall be drawn by the proper officer upon the proper treasurer; * * * shall be presented to the proper treasurer * * * who * * * shall stamp upon the warrant or order the name of the depository by which such warrant or order is payable, and countersign the same, and no warrant or order shall be effective until so stamped and countersigned." §7545 Burns 1914, Acts 1907 p. 391, as amended Acts 1911 p. 616.

Under the Act of 1907 the legal title to the funds vests in the municipality; and when the funds are deposited in a public depository, the relation of depository and depositor is thereby created between the depository and the municipality. The legislature has undertaken to control the entire subject. It has pointed out specifically the method by which claims against the municipality shall be paid; and, in the case at bar, it is evident that the city officers followed the method designated in the act of 1907. It is unfortunate that the two statutes are not entirely harmonious.

The city officials were endowed with ample power to make allowances and to issue orders. They acted within the scope of their authority and their action is binding upon the municipality. The action of the treasurer in stamping and countersigning the orders was a positive direction to the depository to pay them. It was not the duty of the depository to inquire concerning the regularity of the allowances. Indeed, on the facts disclosed in this action, it would have been an impertinence on the part of the depository, had it assumed to question the decision of the city officials or to exercise supervisory power over their discretionary action. The depository was not the guardian of the city's officers. After payment

by the depository, without notice, then as between the city and the depository, the city will not be permitted to say that the allowances were obtained by the fraud of a city employe. It would be unconscionable to allow the city to set up the fraud in order that the loss, if any, may be shifted upon the depository. In determining the rights of the parties, the element of fraud must be wholly eliminated. The only legitimate purpose of the averments of the complaint relating to the alleged fraud is to explain how the orders happened to be made payable to alleged fictitious persons. To give those averments any other effect is not allowable; for it was not the duty of the depository to make an investigation for the purpose of discovering the fraud which the city officers failed to discover. If the opposite view should be adopted, as a rule of law, no reputable bank would consent to accept deposits of public funds. See *Newburyport* v. *Spear* (1909), 204 Mass. 146, 90 N. E. 522, 134 Am. St. 652; *Meyer* v. *Indiana Nat. Bank* (1901), 27 Ind. App. 354, 61 N. E. 596. It follows that the depository is not liable in this action unless it is amenable to the city for negligence in the manner of payment.

The appellant concedes that the written instruments paid by the depository were not checks when drawn by the controller. It insists, however, that they 6. became checks when stamped and countersigned by the treasurer, and that therefore the duty of the depository with respect to the payment of them was the same as the duty of a bank with respect to the payment of checks. From the face of the instruments themselves, it is obvious that they are not checks. 7 C. J. 673. Because the amount stated in each order is "Subject to All Delinquent Taxes," they are not even negotiable instruments. §§9089a, 9089b Burns 1914, Acts 1913 p. 120. They are exactly what they are denominated in the statute, viz.: "orders," and are spe-

cially designed to meet the requirements of the depository law. Nevertheless, it was the duty of the depository to exercise due care in paying them.

If in truth the names written in the orders represented creatures having no existence save in Bush's fancy, and if in truth the controller believed that he was making the orders payable to real persons, then the orders were not payable to bearer. They were payable to real persons or not payable at all. That is the rule applicable to checks, and we perceive no reason why it should not be applied to these orders. *Snyder* v. *Corn Ex. Nat. Bank* (1908), 221 Pa. 599, 70 Atl. 876, 128 Am. St. 780; *Guaranty State Bank & Trust Co.* v. *Lively* (1912), (Tex. Civ. App.) 149 S. W. 211; *First Nat. Bonk of Hastings* v. *Farmers, etc., Bank* (1898), 56 Nebr. 149, 76 N. W. 430; *First Nat. Bank of Hastings* v. *Omaha Nat. Bank* (1899), 59 Nebr. 192, 80 N. W. 810.

Now, is there any proof to support the theory of the complaint? The uncontroverted evidence discloses that during the years 1914 and 1915, labor conditions were such as that the board of public works evidently was obliged to employ whomsoever it could get to do the work of cleaning and repairing the streets and sewers. The laborers who did that work constituted a motley crew. Many of them were transients who would work a week or two and then disappear. Some of them assumed false names, some for the purpose of avoiding the deduction of delinquent taxes from their wages, others for reasons known only to themselves. The number so employed ranged from fifty to sixty in the winter and from 300 to 400 in the summer. During the week ending June 2, 1915, the number employed in the asphalt repair plant alone was eighty-two. Among them were persons known by such names as Stibby Staub, Goosie Costello, and Greasy Bob Walters. Walters was also

known by two other aliases, viz.: Ross Mills and Joe Merz. Stibby Staub also used the name Joe Stark.

The foreman of each gang recorded, in time-sheets provided for that purpose, the days and hours each man worked. From those sheets the time-clerk of the street department made lead pencil payrolls which he turned into the office, where they were typewritten. The street commissioner certified the correctness of the typewritten payrolls, which were then presented to the board of public works. After allowing the items therein, the board certified the allowance of the payrolls to the controller, as "warrants" for the issuance of orders thereon. When the orders came to the street department, which was usually on Friday of each week, they were given to the timekeeper, who "would sort them out in little bunches for the different gangs and deliver them to the foreman of each respective gang." Usually each payroll contained several hundred names, and the orders involved in this action are based on items dispersed throughout the various payrolls. It was the custom of the men in each gang to borrow money from their foreman. Some of them began to borrow on Monday and continued borrowing small sums from day to day; and when pay orders were received, they would repay their loans by indorsing the orders and delivering them to the foreman. It was a common practice for some of the workmen to have their pay orders cashed at saloons, grocery stores, and other places. That the workmen would resort to such methods of obtaining cash might have been anticipated; for they could not well go to the depository during banking hours. Even if they had taken their orders to the depository, who would have vouched for their identity? Consequently all of the orders, except nine, were paid through the clearing house. When the orders were thus paid by the depository, each one bore several indorsements, all of which

were indorsements in blank. Eight of the orders were paid by the depository over its own counter. In some manner, one order reached the treasurer's office where it was confiscated and applied to the payment of delinquent taxes.

The depository balanced the city's pass book and delivered it, together with the redeemed orders, to the treasurer every three or four months. The presumption is that the treasurer took credit on his account with the city for the amount of the orders and returned them to the controller; that the controller laid them before the common council; and that the common council approved the whole matter. The record does not disclose that any city official has ever claimed that the names written in the orders represented fictitious persons or that the depository is in any manner liable to the city. But, in the year 1917, the bureau of public accounting made an examination of the office of the city controller. Field examiners checked the names in the orders with the names in the city directory, in their effort to determine whether the orders were fraudulently issued. Many persons were interviewed, subpoenas were issued, and a grand jury investigation was conducted. A field examiner laid the matter before the corporation counsel and requested him to institute an action against the depository, but the city's legal department ignored the request. A field examiner made the demand on the depository, and this action followed. Although the name of the corporation counsel now in office appears upon the brief, no one representing the legal department of the city government has participated in the proceedings.

In an effort to prove that the indorsements were forgeries, seventeen men were called as witnesses. Some of the names of these witnesses were the same as, while others were similar to, the names in some of

the orders.   One of these witnesses, a post office employe at the time of the trial, confirmed the genuineness of the order payable to him and of his indorsement thereon.   The rest of these witnesses testified that they did not indorse the orders, did not receive the proceeds thereof, and knew nothing about them—mere negative testimony.

Without reciting further details, we are compelled to say that, when viewed in the light most favorable to the plaintiff, the evidence wholly fails to support the averments of the complaint.   If the jurors had returned a verdict for the plaintiff, it would have been the duty of the trial court promptly to have set it aside as being contrary to law.

In view of the conclusion we have reached, it is wholly unnecessary to discuss the instructions.   Where the jury returns the only verdict that can lawfully be rendered on the evidence, nothing in the charge can constitute reversible error.

7.

The report offered in evidence and excluded by the court is a voluminous document comprising 148 pages of the transcript.   It covers all the financial affairs of the city, including every department of the city government; contains elaborate explanations, recommendations, opinions and conclusions of the examiners; recites a multitude of sins chargeable to the city officials but not to the depository; and is certified by G. H. Hendren, State Examiner.   Only a very small part of it has any reference to the matter involved in this litigation.   While the bulk of it is utterly foreign to the controversy in the case at bar and might be available in an action against city officials, it contains statements that would be prejudicial to the depository.   The statute relating to public accounting contains the following:

8-10.

"Any such report as is described in this section, or a copy thereof duly certified by the state examiner shall be taken and received in any and all the courts of this state, as evidence of the facts in such reports stated and contained." §7546i Burns 1914, Acts 1909 p. 136.

It is fundamental that the legislature may not strike down the rights of citizens by invading the province of the judicial department of the state government. While this court is not authorized to declare a statute unconstitutional, nevertheless, where a statute is susceptible of two constructions, one of which would render it constitutional and the other one unconstitutional, it is our duty to adopt the former. Therefore we hold that the legislature intended to declare that such reports only as are found to be competent under the established rules of evidence and in the particular kind of action authorized by the statutes relating to the subject of public accounting, shall be received by the courts.

A witness, who had been a member of two grand juries in 1916 and clerk of a grand jury in 1917 and had otherwise participated in an investigation to 11. determine whether or not the orders were fraudulently issued, was asked the following "question:"

"You may state, Mr. Thomas, if your investigation disclosed that any of the persons whom you investigated in this matter—persons who were of the same name as the payees therein—indorsed their names on these checks."

On what principle could the result of an *ex parte* investigation of that character be admissible? Was the defendant not entitled to cross-examine the persons investigated on the question as to whether they indorsed the orders? For other reasons, the question is so obviously improper that further discussion is useless.

The plaintiff offered a page of the city directory for

the year 1915, for the purpose of proving thereby that no such person as Frank Akers resided in Indianapolis. The manager of the company that prepared and published the directory testified that the names appearing therein were procured by a house to house canvass between Oct. 1 and Dec. 31, 1914. The order payable to Frank Akers was issued June 2, 1915. Therefore, the fact that his name does not appear in the 1915 directory cannot serve as a basis for the inference that the order was not properly endorsed in the name of Frank Akers, whether the name was real or assumed.

The right of the attorney-general to institute and maintain this action has not been questioned, and under certain provisions of the Code it seems to be our duty to regard it as having been waived. §§344, cl. 6, 348 Burns 1914, Acts 1911 p. 415.

Judgment affirmed.

## ON PETITION FOR REHEARING.

DAUSMAN, J.—The opinion in *Citizens Nat. Bank* v. *Reynolds* (1920), 72 Ind. App. 611, 126 N. E. 234, contains the following statement: "The rule is well established that a bank on which a check is drawn must ascertain at its peril the identity of the person named therein as payee." Counsel for appellant insist that the rule there stated is applicable to the case at bar. The contention cannot be sustained. From the nature of the Reynolds case, from the statement of the facts of that case, from the opinion itself, when considered as an entirety, the clear implication is that the rule is limited to the class of cases wherein a check is presented for payment *by a person who claims to be the payee.* However, in order that no one may be misled, the rule above quoted is hereby expressly so limited.

The general rule is that a bank may not have credit for money paid on its depositor's check unless the payment has been made strictly in accordance with the depositor's directions as stated in the check itself. But, to that rule, there are some exceptions. A bank is bound to know the signature of its depositor; but it would be a strange and arbitrary rule that would require a bank to know the signature of every person to whom its depositor issues a check. In this age of industrial activity, bank checks pass freely from hand to hand. Where a check passes from hand to hand by successive indorsements, each indorser assumes a well-defined liability (Article 5, Negotiable Instruments Law [§9089h2 *et seq.* Burns 1914, Acts 1913 p. 120]); and where a check is presented for payment by an indorsee, the drawee is not bound to institute an investigation to determine the genuineness of the signature which purports to be the payee's indorsement, but may rely upon the subsequent indorsements. If the drawee pays a check to a holder by indorsement and it develops that the purported indorsement of the payee is, in truth, a forgery, the bank ordinarily may not have credit therefor against the account of its depositor; but, in that case, the depositor must have exercised due diligence in the matter of examining his cancelled checks and in giving the bank timely notice of the forgery, or he cannot recover from the bank. *Fletcher, etc., Bank* v. *Crescent Paper Co.* (1923), 193 Ind. 329, 139 N. E. 664.

As stated in the original opinion, the orders involved in the case at bar are not checks. But if the rules of law applicable to checks were applied to these orders, the appellant would not be benefited thereby; for the record before us utterly fails to show any diligence whatever on the part of the city.

The petition for a rehearing is denied.